the action is beyond doubt. It seems to us that there can be no doubt that such a cause of action survives the dissolution. The order should therefore be affirmed, with a further modification providing for the bringing in of the receiver, and the continuance of the action against him to final judgment.

The order, as so modified, should be affirmed, with costs to the respondent.

(24 App. Div. 502.)

HOWELL v. ROCHESTER RY. CO.

(Supreme Court, Appellate Division, Fourth Department. December 18, 1897.)

1. STREET RAILROADS—INJURIES TO PERSONS ON TRACK—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

In an action against a street railroad company for the death of a five year old boy, there was evidence that the boy and others were playing in the street, and passing back and forth across the tracks; that the motorman had seen them do this three or four times; that the car approached at a speed faster than cars usually run; that, when the car was 29 feet from the boy, he crossed the track in front of it, and stopped 4 to 6 feet from the track, and then turned to run back across the track, from 5 to 7 feet in front of the car; that he was struck by the lifeguard, fell upon it, was carried along some distance, and was finally jolted off, and the front wheels of the car ran over him; and that the car ran over 60 feet after he was struck before it was stopped. The motorman testified that he saw the children when 200 feet away; that he could stop the car in 30 feet; that when the boy first crossed he turned off the power and applied the brake, and brought the car under control; and that, after the boy crossed over, he immediately applied the power and released the brake. *Held*, that the question of defendant's negligence was for the jury.

2. SAME—INSTRUCTIONS.

It also appeared that when the boy was 3 or 4 feet in advance of the lifeguard, and the car was under control, and practically stopped, the power was applied, and that the boy then passed over a distance of 4 feet while the car was passing over the same distance. *Held*, that the evidence did not justify a charge that the jury could not predicate a finding of negligence on the facts that the car, after leaving a certain avenue, over 400 feet from the place of the accident, went on south with the power on and the brake loose; that the motorman saw said boy and other children playing at the side of the street; that said boy had run across the track; that the motorman then put on the brake and threw off the power, and slowed up the car; that the boy got safely across the track, and continued running after he got east of the rail; and that then the motorman threw off his brake and put on the power.

3. SAME.

Nor did it authorize a charge that if, when the boy started to run back, the car was only seven or eight feet from him, with the power on and the brake off, there was no evidence on which the jury could find that it was then possible to stop the car before a collision, either with the brake or the reverse.

4. SAME.

In an action against a street-railroad company for the death of a boy who was killed while attempting to cross the track, it was not error to charge "that as the motorman saw the child ahead, playing in the street, it was his duty to have his car under control until the danger was passed," where it was predicated on the particular situation disclosed by the evidence, and was but another mode of saying what had been more fully and explicitly said as to the motorman's duty under the evidence, in an instruction not objected to.

49 N.Y.S.—2

**5. SAME—WITNESSES—CROSS-EXAMINATION.**

     In an action against a street-railroad company for the death of a boy who was killed while attempting to cross the track, a motorman was called by defendant as an expert, only, and asked, "Assuming the car, on a level and a dry rail, is running six miles an hour, and you are called on to bring it to a stop in an emergency, within what distance can you stop it by the use of a brake alone?" He answered, "In not less than 40 feet. Assuming the same conditions, using the reverse, I should say from 30 to 35 feet." He also testified as to the most effectual way of stopping, what should be done, and the movements the motorman would have to make. On cross-examination he testified to what he would do if his car were going as the car in question was going, and a sudden emergency presented itself, and also stated what he would do under varying circumstances. *Held,* that the question, "What would you do, as an expert motorman, in case you saw children ahead on the track?" was proper cross-examination.

**6. WRONGFUL DEATH—DAMAGES.**

     An administrator is not limited to nominal damages for the death of a minor child; the amount of recovery being left very largely to the jury.

Appeal from trial term, Monroe county.

Action by John H. Howell, as administrator of the estate of Jesse W. Howell, deceased, against the Rochester Railway Company, for the death of plaintiff's intestate, caused by defendant's negligence. From a judgment in favor of plaintiff, and from an order denying its motion for a new trial, made on the minutes on all the statutory grounds, defendant appeals. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Charles J. Bissel, for appellant.
Quincy Van Voorhis, for respondent.

GREEN, J. About 12 o'clock, noon, on the 15th day of October, 1895, Jesse W. Howell, plaintiff's minor child, was run over and killed by a car operated by the defendant on South Clinton street, in the city of Rochester. He was a boy of five years of age, and lived with his parents on the westerly side of the last-named street. So far as appears, he was in good health, and possessed the intelligence and power of observation which a child of that age usually possesses. For about four weeks preceding his death he had attended the primary department of a public school on Averill avenue. The school house is about 239 feet west of South Clinton street. The child was returning home from his school, with a number of companions of his own age. To reach his home, it was necessary to pass easterly, along Averill avenue, to South Clinton street, and thence southerly, along the westerly side of South Clinton street, to his home, near Grand street. Upon reaching South Clinton street, the children separated into little parties of three or four each; and two or more of these groups were playing in the street, and, in their play, running back and forth across the railroad tracks. They were playing in that manner when the car came in sight, and continued to do so until the plaintiff's intestate was run over and killed. The car was moving on a down grade of 20 feet to the mile southerly from Averill avenue, and

the witnesses for the plaintiff gave evidence tending to show that it was going at "a pretty fast speed," and "faster than cars usually run." The motorman and conductor, however, testified that it was moving at the rate of only five or six miles an hour. There were three or four children in the group to which the intestate had attached himself. It appears that these children, in their play, had crossed the tracks in safety three different times, and all but the intestate crossed the fourth time. In his attempt to cross the fourth time, he was struck by the fender or guard in front of the car, fell upon the same, rolled over two or three times while in that position, was carried along for some distance, and was finally jolted off, and the forward wheels of the car passed over him. It is admitted by the pleadings that death occurred by reason of the boy's being run over by the car. The main contention of the defendant is that the evidence wholly fails to establish any negligence on the part of this defendant. The decision of that question necessitates an examination of the evidence bearing upon the same.

One of the plaintiff's witnesses testified that he saw the accident; that he came out of a store which was near Grand street; that he stood on the east side of South Clinton, near Grand, street; that as he looked to the north, along South Clinton street, he saw the school children coming along that street; that he saw the car when it was at or near Averill avenue, which is 440.14 feet north of Grand street. He said:

"When I first saw the little boy, he was coming down the sidewalk; running out to the street, and back to the sidewalk again. There were four or five children there, maybe more, playing around together."

He further testified that three or four of them, among whom was the intestate, came from the sidewalk, over the curb, and were chasing and throwing leaves at each other; that they were crossing the railroad tracks; that they had crossed the track a number of times before the accident; that, the last time he saw them cross over, they crossed from the west side of the street over the westerly track, and stood in the middle of the easterly track.

"After they had crossed the south-bound track, and got in the middle of the north-bound track, they turned around and went right back again. They were running and playing, and, when they turned around and went back again, that was the time the little boy got struck. When the little children started to run back from the north-bound track, they were one after the other, running. The hind one was Jesse Howell. They were right back of each other, as close as they could run. I kept my position right in front of the bakery up to the time when the boy was actually struck. When he was hurt I ran out into the street to save him. Before he got hurt I kept standing on the sidewalk, three or four steps north of the bakery. When the three children started from the center of the north-bound track to run back, they ran all the way until the little Howell child was struck. The two first ones got across without being struck. It was the lifeguard in front of the car which struck the boy. He fell right back on it." "The car came down there in a pretty fast speed. She came along as any common, good, everyday horse could trot,—maybe a little faster. I couldn't run as fast as the car went. All I could tell, the car went down there in a good speed. That is all I could tell. This car came along in a good trotting speed. I didn't see that it slowed up any before it struck the boy."

Another witness, who was near the corner of Grand and South Clinton streets, testified that he saw the car coming southerly before the accident, and that it was going at a "very good speed," and "faster than cars usually run"; that he saw at least half a dozen children, if not more, running back and forth over the tracks; that as plaintiff's intestate started to go from the westerly side across to the easterly side of the street, and while between the rails of the westerly track of defendant, he was struck by the car. He said:

"I swear that, when the child was struck, he was running towards the east side of the street. That is the best of my recollection."

Another witness, who was passing along South Clinton street at the time of the accident, testified:

"When I first saw Jesse, he was directly in front of me. I didn't know him at that time. There were three other children with him. There were quite a number of other children stringing along, coming out of school on Averill avenue. I saw some of them on South Clinton street, besides these four. It was about a quarter to twelve o'clock. Jesse and the children with him were on the west side of South Clinton street; were running along, playing. The four started to run across the street. They were gathering leaves, I should judge, and throwing them at each other; and he started from the west side to run to the east side, and as he got on the track he was struck by the car. My recollection is, it was the first time he crossed." "I was going in the same direction that the car was. I have often ridden on the cars of Rochester, and seen them going on South Clinton street and other streets. That car was going very fast,—faster than they ordinarily run. I saw the car when it struck the boy. From the time I first saw the car, when it passed me, down to the time it struck the boy, I do not think it slowed its speed. That is my judgment and recollection." "At the time the car struck the child, the front of it had passed beyond me about five feet. The little child was on his feet at the time he was struck. The lifeguard in front struck the side of his feet."

The car ran over 66 feet after the boy was struck before it was stopped. The motorman of the defendant, on the car which produced the death of the intestate, testified in behalf of defendant that he had operated cars upon that street, in the employ of the defendant, for three years, and ever since the company had introduced electricity as motive power upon that street; that, as he passed Averill avenue, he saw three children along the side of the street, at the end near Grand street, between the curb and the track; that the car was running five or six miles an hour. He said:

"Just as I got close to them, one child ran across the track, turned round, and ran back again. The others stayed where they were, right over near the curb,—about halfway between the curb and the track. They were not playing at all. They were walking along; stopped every little while. They were on the west side of the street,—at my right as I was going. When the little fellow ran across the track, I should judge, he was about a car length, or some twenty-nine feet, ahead of me. The length of the car is near as I can judge. I saw him when he started to run, and I commenced to stop the car, and rang the gong a dozen times when I came along. I rang it for Averill avenue. I didn't ring it again until I got up pretty close near where they were. When I saw him start to run, I put on the brake and threw the power off. I screwed the brake up so I had control of the car; could stop it. It didn't come to a stop. When the little fellow ran across and in front of me, before he turned round, he went over the west rail of the east track. After I saw him cross over the track I let the brake go and put the power on, and started the car." "Q. What effect did that have on your car?

A. It started it up. It started the car. Then he turned around and ran back again. When I saw him turn around to run back, he was not over five, six, or seven feet—somewhere along there—in front of me. When I saw him turn back I threw the power off, put on the brake, and then reversed the car and let the brake go. When I reversed the car it did not catch. The rail was too greasy. The lifeguard struck the little fellow. When it struck him he was about the center of the track. He fell right straight across, and I didn't see him after that. He fell right towards the car."

He further testified that he did not have the power on at Averill avenue when he went across the street; that he took it off 100 feet before he reached Averill avenue; that he did not know where the grade commenced there; that he took it off without any reference to grade; that he always supposed that was a pretty level road there. He further says that he did not apply the power to the car until he had arrived 100 feet south' of Averill avenue; that he then ran the car with power on for 50 to 100 feet, to a point 200 feet south of Averill avenue. He said:

"I can tell the length of the car. I made a practice of that,—stopping the car in a car length; stopping at cross walks. I did not always have a mark on the side to go by. I can stop a car on the cross walk the first time I run over just as well as if I ran over it twenty years."

He says that, from a point 200 feet south of Averill avenue—

"I didn't put the power on again until I came up to where the children were. I kept slowing up right along, going along there. The power was off. I had lots of time. I wasn't in no hurry. I was just soldiering along, just the same as I was all the way from the four corners. My putting the power off didn't have anything to do with the child being on the street. I next put the power on when I started the car after the child ran across the street. I put the power on then. The little boy was then on the east track, over the west rail. The east track is four feet from the west track. The boy just got over there, and he turned around and came right back. I don't think he stopped over a second,—ran over there, and turned around and came back,—and he didn't go more than four feet from my track. Q. You put the power on with that boy running four feet from your track and back again? A. Yes, sir; anybody would. When I put the power on the other boys were over where they were the same time. I didn't see the other boys make a move. They didn't come across the track, in fact. I didn't see them come up to the track. They didn't chase one another. I heard the conductor sworn here. I didn't see no children running out to the track. He was the only boy. He ran away from the crowd, and ran across the track. He was the only one who ran across the track,—the only one I saw that came near the track. The only thing the others were doing, they were walking. I yelled at the boy. I was in the vestibule when I yelled,—right close up; within five, six, or seven feet of him. When the boy started to cross the track he was about a car length, the first time, in front of the car; the last time, six or seven feet from the front of the car, from where I stood. From the end of the car out to the end of the lifeguard is about three feet, I should judge, and he was three, three or four, feet—somewheres along there— in front of the lifeguard. Car 241 is my regular car. I had sand in the box. I didn't have time to put on the sand. I didn't put it on. You put the sand on by jumping on the spring with one foot, pressing downward. You can't reach it without moving the other foot. Got to step over to the side of the car."

Testifying as to the distance within which he could stop the car, he says:

"On that day I didn't run over a car length after I tried to stop it. I stopped it within a car length. I had just started the car. I didn't say what speed I was going. Going at the rate I was, I did stop the car within

a car length, and that is inside of thirty feet. I stopped it in about a car length."

It appears that on the day of the accident a coroner's inquest as to the death of this child was held, and this motorman was a witness. He then testified that there were four or five children playing on the west side of the road when he was approaching with his car southerly from Averill avenue. Upon the trial of this action he was shown the original minutes of the testimony taken before the coroner's jury, and stated that it was his signature thereto; that he signed the testimony after it was read over to him. He was then shown the testimony aforesaid, and asked this question:

"Look at that, and see if you testified as follows: 'There were four or five children playing on the west side of the road.' Did you swear to that? A. I might have; but that was a mistake, if I did. I signed it, and it was read over to me. The testimony was taken on the day of the accident. Q. And you then swore that there were three or four children playing along the side of the road? A. I might make a mistake, but that is not what the children were doing. I guess I must have signed it that day, and sworn to that testimony, if it is there. I say now they were not playing; they were walking along."

The conductor of the car testified that the car was proceeding at the rate of five or six miles an hour as it proceeded southerly from Averill avenue; that he heard the bell sounded by the motorman; that he looked out of the window in the front part of the car, and saw a child running across the track; that the child was not over 25 or 30 feet ahead of the car at that time; that he felt a vibration of the car, as though the motorman was endeavoring to stop it; that the car slowed up; that after the child had crossed the track the car started ahead again; that he then saw the child start to come back again; that, after the child started to run back, he fell, and disappeared from witness' view; that the child was ahead of the car—

"Not over eight feet; very close to the car. I can't tell whether the reverse was applied after that. After the boy was struck, I do not know whether I could feel any slowing-up motion. I should hardly think I could. Still, there must have been."

He further testified that he was sworn before the coroner's jury on the day of the accident, that the facts were fresh in his recollection at that time, and that upon his examination he testified as follows:

"I cannot tell whether the child saw the car or not. I think that he was playing."

He was then asked this question:

"Now, tell what there was you saw that showed the children were playing. A. Two or three little children. I saw some little children close to the right track,—the right rail. They were running the opposite way; to the right; towards the right sidewalk on the right; either way you are a mind to have it; towards the west side of the street. When I first saw them, Jesse ran across onto the other side, between the two tracks, and the other children—I don't know whether there were three or four in the party—ran the opposite way. When Jesse was struck he was running the same way they were. When I first saw these children they were close up to the track, I should judge. They didn't run across the track and back again.

Q. Where were they when you first saw them, with reference to the west rail of that track? A. Right up close to the track. Q. Standing still? A. They just turned around and ran back. I can't say that they were throwing things at each other. I thought they were playing, as all children naturally do in going home from school. In going along there on other days I have seen them playing all the way, chasing one another; common occurrence with all children."

There was evidence given by both plaintiff and defendant concerning the condition of the track on the day of the accident, and the distance within which a car could be stopped, running upon that track at different rates of speed. It was claimed on behalf of the defendant that there were leaves upon the track, and that the track was wet. Evidence was given on behalf of the plaintiff showing that the track on that day was in fair condition, and was not so affected by the leaves and the rain as to preclude the possibility of stopping it within the space of 30 feet. The evidence of the motorman himself seems to show conclusively that the car might have been stopped within its own length; for it will be observed that he testifies that when he saw the child first crossing the tracks the car was then only its own length (29 feet) distant from the child, that he then turned off the power and applied the brake, and that before the child had passed over 4½ feet, the width of the track, he had the car under control, and could have stopped it then and there. His evidence further discloses the fact that at that period of time, when he says he had the car under control and could have stopped it, the car was then 5, 6, or 7 feet, only, north of the boy, who was then, as testified by the motorman, standing between the rails of the easterly track of the defendant, and was then distant from the easterly rail of the track upon which the car was proceeding 4 feet and 1 inch, as it is undisputed that that is the distance between the two tracks of defendant at that point. The motorman further testifies that although he had his car under control, so that he could have stopped it, when the boy had passed over the easterly rail of the track upon which the car was proceeding, he immediately, upon the child's passing over that rail, applied the power and released the brake, and that the car started with a new impetus; that he then saw the child turn to run back across the tracks; and that although he immediately threw off the power, rung his bell, and applied the brake, he could not stop his car; that the boy was struck by the lifeguard, and, as appears practically uncontradicted, the motorman did not stop his car until it had traversed a distance of more than 66 feet. It further appears from the evidence that after the child was struck he was carried some distance upon the guard; that he rolled over two or three times, and was finally jolted from the car to the street, and the front car wheels passed over his body, causing death. One of the witnesses for the plaintiff testified that he was where he could see the car as it proceeded southerly, after the accident. He testifies that he looked up the street, and saw the child on the fender in front. "After I first saw the little child on the fender, the car might have traveled thirty or forty feet. It might be more, and it might be less. When I looked up and saw the child

on the fender, it did not roll right off. It pushed ahead awhile, and then rolled off."

The evidence tends to show that, if the motorman had been vigilant and had made a proper effort, he would have had his car under control, and could have stopped it before the deceased rolled off the guard, and the accident would not have happened,—at least, not in its full extent, as it clearly appears that the child was carried upon the guard for some distance before he rolled therefrom and received the injury which resulted in his death. The motorman was required to exercise a higher degree of vigilance and care than under ordinary circumstances. He was acquainted with the locality. He knew of the close proximity of the tracks of the defendant to a public school, and that a large number of children of tender years were accustomed to be upon that portion of the street at or about the hour when this accident occurred. Not only that, but from his own confession it appears that, when the car was between 200 and 300 feet northerly from the place of the accident, the motorman saw these young children in the street, between the curb and the track. As he approached them, they approached the track, and deceased passed onto the track when the car was only about 29 feet from him. The car, according to the evidence of the motorman, was brought under control within a space of about 22 feet, so that he could have actually stopped it. The child was still upon the move, passing over the first track and the space between the two tracks, and then immediately turned to recross the westerly track. There was evidence to warrant the jury in finding that the group of children in which was the deceased had crossed over the tracks three or four times while the car was in sight, and that the motorman could easily have seen, and did see, them. So that, under the circumstances and the evidence of this case, it was for the jury to say whether or not it was apparent that the child might change his position at any moment; and turn back over the track, as he had theretofore done, and bring himself into danger. But beyond all this is the evidence of the conductor and the motorman that, when the car was within not to exceed 8 feet of the child, it had been brought under control, and could then have been stopped; that the brake was then released and the power applied; that the child turned and passed over the space between the two tracks while the car was passing over a space not to exceed 8 feet; that the child was struck by the guard, and thrown upon and carried upon it for some distance before he was thrown therefrom, run over, and killed. This evidence tends to show that, if the motorman had done his duty, the car could have been stopped in time to have averted the death of plaintiff's intestate. The claim of the defendant that the reason the car was not sooner stopped was because the track was wet, and there were leaves upon it, will not stand for a moment. Its own employés testified that, while the car was running at the rate of 5 or 6 miles per hour, it had been brought under control, and could have been stopped within a space of less than 29 feet, upon the same track, under the same conditions. The jury had before it all this evidence, and from such evidence it might consistently find that the defendant was guilty of negligence.

At the request of the counsel for the respondent, the court submitted to the jury the question whether plaintiff's intestate was, at the time of his death, sui juris, or non sui juris. Evidence was given upon the trial on the question of the negligence of the parents of the intestate, in allowing him, at his age, to attend school and be upon the street unattended, save by his sister, only two years older; and the question as to whether or not the parents were negligent was clearly and fully presented and submitted to the jury by the learned trial justice in his charge. The jury was justified by the evidence in finding that no negligence could be attributed to the deceased or his parents, and that finding is not challenged by the learned counsel for the appellant. Upon the whole case, the question of the negligence of the plaintiff's intestate, of the parents, and of defendant, was for the jury, and the verdict is sustained by the evidence.

Appellant also alleges error in the admission of evidence. Michael J. Ryan was a motorman in the employ of defendant, and acted for it as an instructor of other motormen. He was called by defendant upon the trial of this action, as an expert, only, to show how difficult it is to stop a car, and within what distance it could be done under varying circumstances. Defendant's counsel, in the course of the examination of this witness, asked this:

"Q. Assuming the car, on a level rail and a dry rail, is running six miles an hour, and you were called upon to bring it to a stop in an emergency; from the time the emergency presents itself, to the time you bring your car to a stop, within what distance can you stop it by the use of a brake alone? A. In not less than forty feet. Assuming the same conditions, using the reverse, I should say from thirty to thirty-five feet."

He further testified upon his direct examination as to the most effectual way of stopping a car, and what should be done, and the movements the motorman would have to make in order to stop it. Upon his cross-examination he was interrogated as to how he would stop a car. He answered:

"Supposing I were going south on that line, and had got beyond Averill avenue, perhaps half way to Grand street, and a sudden emergency presented itself, I would throw off the power, and reverse the car and apply the power."

The witness further proceeded, at considerable length, to show what he would do under varying conditions and circumstances. He was then asked this:

"Q. What would you do, as an expert motorman, in case you saw children ahead on the track?"

This was objected to by defendant as not proper on cross-examination, and, secondly, as having no legitimate bearing upon the case. The objection was overruled, and exception taken by defendant. In this we think there was no error. It was, in effect, the same question as that propounded by defendant's counsel, except that he asked the witness what he would do in a sudden emergency, and by the last question witness was interrogated as to what he would do if he saw a child ahead upon the track. Both questions were directed to a "sudden emergency." The witness had been produced by the defendant to testify in its behalf in a case where it was alleged that a child upon defendant's track, ahead of a moving car, had received

injuries; and one of the questions litigated was whether its motorman had performed his duty in this sudden emergency. The defendant, in order to impress the court and the jury with the fact that its motorman had performed his duty, asked this expert what he would do in a sudden emergency. It must have been clear to the counsel, the court, and the jury that "the sudden emergency" was the child upon the track just ahead of the moving car. It could not have had more weight with the jury, nor have been more clearly understood, if the learned counsel for defendant, in propounding the question he did upon that branch of the case, had used the very words of the question to which he objected. I think it was a proper subject of cross-examination, and that the learned court committed no error in overruling the objection thereto.

There are other objections to the admission and exclusion of evidence, to which exceptions were taken by defendant's counsel. I have examined each, and am satisfied that, if the evidence excluded had been given as fully and precisely as the learned counsel stated in his offer, it would have had no legitimate bearing upon the case, and that its exclusion presented no error. Neither can I conceive how the evidence which was admitted, and to the admission of which an exception was taken, was in any manner prejudicial to the defendant. The only remaining questions, therefore, which require examination, relate to the exceptions taken to the charge of the court, and its refusal to charge as requested. After the charge of the court, plaintiff's counsel requested the court to charge "that as the motorman saw the child ahead, playing in the street, it was his duty to have his car under control until the danger was passed." The court so charged, and the defendant excepted. The charge was predicated on the evidence before the jury, and applied to the particular situation and circumstances of the case as disclosed by the evidence. It appeared from the evidence of the motorman that he had seen the child between the curb and the track upon which his car was moving from about the time he left Averill avenue, which was 335 feet north of the place of the accident. He had further testified that, from a point 135 feet north of the place where the child was struck by the fender of the car, the power was turned off, and remained so until after plaintiff's intestate had crossed the track in front of the car. Evidence on behalf of the plaintiff was given, tending to show that the car was running faster over that space than cars ordinarily run, and that there was no perceptible slackening of the speed of the car from the time it left Averill avenue until the collision occurred. That evidence had been brought to the attention of the jury by the charge of the learned court. Upon that question he charged as follows:

"If, after the motorman saw the child, he instantly did everything, in the exercise of his duty, that would suggest itself to a careful, prudent man in his position; if he made every reasonable effort to stop that car which it was possible to make under the circumstances,—then he was not negligent in that regard, and, of course, no negligence can be attributed to this company for any act or omission of his. To what extent could this motorman have foreseen that this child was to run across the street? To what extent

was he called upon, under the circumstances of the case, to anticipate that this child, having crossed the track in safety, would suddenly return? Around that instant of time revolves the whole of the difficulty in this case. If this man had reason to suppose, or ought to have anticipated, that it was not safe for him to reapply the power until that child was so far out of harm's way that it was impossible for this accident to occur, then he was, of course, negligent in doing what he did; but this railroad company and its motorman were not insurers of the safety of this child, and were not called upon to anticipate things that were not reasonable or probable. The question is whether, under the circumstances of this case, this motorman ought to have waited with this car until he could have seen or determined whether this child would attempt to come back over the track. If there was nothing in the conduct of the boy after he had passed this track to indicate that he was coming back; if the motorman had a right to assume that, having crossed the track, as he did, in front of the car, he would pursue his journey across the entire width of the street, or remain where he was until the car had passed,—then it was not negligence to put on the power and put his car in motion."

The charge excepted to was but another mode of saying what had been more fully and explicitly said as to the duty of the motor-man under the evidence. The charge objected to, it will be seen, limits the time within which the motorman should have his car under control to that period of time in which the child was exposed to this danger, and is to the effect that if, under the circumstances disclosed by the evidence, the motorman should have apprehended that there was danger to the child, he should have kept his car under control until that danger had passed. We cannot see, therefore, that the jury was misled in this case by the charge as made.

The defendant's counsel asked the court to charge the jury that:

"If they believe that this car, after leaving Averill avenue, went on south with the power on and the brake loose; that the motorman did see the children playing at the side of the street; that the little deceased had run across his track; that he then put on the brake and threw off the power, and slowed up his car; that the deceased got safely across the track, and continued running after he had gotten east of the east rail; that then the motorman threw off his brake and put on his power,—that, on that state of facts, the jury cannot predicate a finding of negligence."

The court declined so to charge, and the defendant's counsel duly excepted. Defendant's counsel, in his brief, contends that such instruction was justified by the evidence of the motorman and the conductor. I hardly think their evidence, which I have freely quoted and commented upon, would warrant such an instruction. It appears from this evidence that when the child was 3 or 4 feet in advance of the guard of the car, and the car was under the control of the motorman, and practically stopped, the power was applied. The child then passed over a distance of 4 feet while the car was passing over the same distance, so that the car and the child were moving at about the same rate of speed. And, if this evidence was believed by the jury, it became necessary for it to pass upon the question of whether the motorman performed his full duty after the child had been struck by the guard, as he was carried some distance thereon, and the car was not stopped until it had proceeded more than 66 feet from the point of the accident.

Defendant's counsel also requested the court to charge the jury that:

"If the jury find that when the little boy started to run back the car was only seven or eight feet from him, with the power on and the brake off, there is no evidence in this case upon which they can find that it was then possible to stop the car before a collision with the boy, either with the brake or the reverse."

The court declined so to charge, and the defendant's counsel duly excepted. What has just been said regarding the preceding request is applicable to the last one, and I think the court was equally justified in refusing to charge as requested.

Defendant's counsel further asked the court to charge the jury that in any view of the case the plaintiff can recover no more than nominal damages. The court declined so to charge, and the defendant's counsel duly excepted. The rule of damages in actions of this character has been fully established, and the amount of recovery has been left very largely to the jury upon the proof presented.

"The damages to the next of kin in that respect were necessarily indefinite, prospective, and contingent. They cannot be proved with even an approach to accuracy, and yet they are to be estimated and awarded, for the statute has so commanded; but even in such case there is, and there must be, some basis in the proof for the estimate; and that was given here, and always has been given. Human lives are not all of the same value to the survivors. The age and sex, the general health and intelligence, of the person killed; the situation and condition of the survivors, and their relation to the deceased,—these elements furnish some basis for judgment. That it is slender and inadequate, is true, but it is all that is possible. * * * Upon that basis, and from such proof, the jury must judge; and, having done so, it is possible, though not entirely easy, for the general term to review such judgment and set it aside, if it appears excessive, or the result of sympathy and prejudice. A difficult duty, we grant, but not for that reason to be abandoned. In its intrinsic nature, it is no more difficult than to determine whether a verdict is excessive in an action for slander and libel, where the injury is to reputation, or in actions where pain and suffering may be considered in ascertaining the loss. The supreme court has never abdicated its power of review in such case, and should not in those under the statute. The jury was compelled to judge in an atmosphere freighted with sympathy. In the general term the deliberation may be more cool and thoughtful, and while the judgment of the trial court should not be lightly disturbed, it should not be held necessarily conclusive." Houghkirk v. Canal Co., 92 N. Y. 225.

For many years there was upon the statute books a law limiting the damages in a case like the one under consideration to the sum of $5,000. That limitation has been removed by constitutional amendment, but that has not necessarily changed the rule of damages. It must be presumed that juries will honestly perform their duties; that the judges presiding at jury trials will strictly and impartially perform their duties, and prevent injustice to defendants in actions of this character, and exercise their power of correcting or setting aside verdicts of juries which are excessive, or which are the result of sympathy, prejudice, or other improper motives not justified by the evidence. The appellate court still retains the power of review in such cases, and the power to reverse or modify verdicts of juries and orders of judges presiding at such trials; so that the rights of defend-

ants in cases of this character are protected as fully and completely as though the constitutional amendment did not exist.

The judgment and order herein should be affirmed, with costs.  So ordered.  All concur.